UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Cr. No. 05-05-170 (RJL) |
| | : | |
| CLIFTON GORHAM, | : | |
| Defendant. | : | |

**GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANT'S
MOTION FOR TO SUPPRESS IDENTIFICATION
EVIDENCE AND FOR A LINE-UP**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes both Defendant's Motion to Suppress Identification Evidence and Defendant's Motion to compel a Government witness to view a line-up. In support of this opposition, the Government relies on the following points and authorities and such other points and authorities that may be adduced at a hearing on the matter:

**I.    BACKGROUND**

1. The Defendant has been charged in a three count indictment with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of Crime Punishable by Imprisonment for One Year or More, in violation of 18 U.S.C. § 922 (g)(1), Assault With a Dangerous Weapon, in violation of Title 22, District of Columbia Code, §402, and Possession of a Firearm During the Commission of a Crime of Violence or Dangerous Offense, in violation of Title 22, District of Columbia Code, §4504(b).

2. On April 19, 2005, at approximately 6:40 p.m., MPD Officer Dax Banks was in the vicinity of the west alley of the 1100 block of First Place N.W., Washington D.C., when he heard

four loud blasts. The officer proceeded northbound to the 1100 block of First Place N.W. to investigate. As he was approaching his destination, he saw several children running southbound screaming. An unidentified female pointed toward M St. N.W. and yelled "He went that way on a bike." After turning right onto M. St. N.W., Ofc. Banks observed a black male with a bald head and black shirt with blue jeans pedaling a bicycle towards the intersection of North Capitol and M St N.W.

    3. Ofc. Banks immediately began driving towards the Defendant to make contact and investigate the blasts. The Defendant continued pedaling away from the officer, even though the officer directed the Defendant to stop. During this pursuit the Defendant lost control of the bicycle, dropped and abandoned it, and continued to flee on foot. The Defendant then ran across North Capitol Street. While running, the Defendant began holding his waist area as if he were trying to conceal or retain an object. The Defendant ran behind a large truck and removed and threw what the officer observed to be a black object into the truckbed.

    4. It was at this point in the pursuit that the Defendant came to the attention of Government Witness A. Government Witness A was stopped in traffic as the Defendant ran past and stopped at the truck. Government Witness A was located immediately behind and one lane over from the truck into which the Defendant stopped beside. Government Witness A watched the Defendant as he produced a semiautomatic handgun from his waist area and proceed to throw it into the truck bed. Government Witness A saw the police approaching the Defendant, and watched the Defendant flee the scene with the police in hot pursuit. Government Witness A, knowing that the truck driver might leave the scene with important discarded evidence, then drove past the truck and signaled the truck driver to stop. Both vehicles stopped, and waited for

police to arrive to take possession of the single item in the truck's bed – a black Glock semiautomatic handgun.

5. While the police were speaking with Government Witness A at the scene of the two stopped vehicles, the Defendant, who was apprehended nearby, was being walked back to a police vehicle for transport from the scene. It was at this time that Government Witness A indicated to the police officer to whom he was speaking that the man in the police custody was the same man he saw running from the police, crossing North Capitol directly in front of him, stop and discard a handgun in the truck bed, and continue to flee from the scene. This identification occurred shortly in time after the chase passed in front of Government Witness A.

6. Finally, at that time of year, the sun had not yet set, and daylight was still present by which both Ofc. Banks and Government Witness A could observe the Defendant.

7. Defendant has now requested that the Court either suppress the show-up as unduly suggestive, or in the alternative, order Government Witness A to view Defendant in a lineup. The Defendant argues that in the absence of a lineup there is a reasonable likelihood that the Government Witness A will misidentify him as the possessor of the abandoned gun at trial. Defendant's requests should both be denied because the facts of this case do not come close to either (a) have an out-of-court identification that was unduly suggestive, nor (b) creating a reasonable likelihood of mistaken misidentification at trial.

## II.    ARGUMENT

### 1.    Show-Up Was Not Unduly Suggestive

At the outset, the Government notes that Defendant bears the burden of showing that any identification was so unduly and impermissibly suggestive as to warrant suppression. Simmons

v. United States, U.S. 377, 384 (1968).  Here, the Defendant's identification resulted from a lawful, indeed appropriate, spontaneous investigation of the crimes alleged.  An identification procedure violates a defendant's right to due process only if it is so unreliable that it produces a "very substantial likelihood of irreparable misidentification." Manson v. Brathwaite, 432 U.S. 98, 116 (1977).  Indeed, even if police engaged in suggestive procedures, the identification is still admissible if it is reliable.  *Id.* at 114 ("reliability is the linchpin in determining the admissibility of identification testimony").

The District of Columbia Court of Appeals has repeatedly upheld the validity of show-up identification procedures carried out, as in the instant case, in close spatial and temporal proximity to the crime itself.  See Wilkerson v. United States, 427 A.2d 923, 927 (D.C. 1981); Singletary v. United States, 383 A.2d 1064, 1068 (D.C. 1978); Cates v. United States, 379 A.2d 968, 976 (D.C. 1977).  In so doing, the court has noted that although there is inevitably some degree of suggestivity to a show-up, the overall benefit to both the defendant and law enforcement authorities of a prompt, on-the-scene confrontation outweighs any inherent suggestivity.  Singletary, supra, 383 A.2d at 1068.  See also Washington v. United States, 334 A.2d 185, 186-87 (1975).  In United States v. Perry, 449 F.2d 1026 (D.C. Cir. 1971), the court recognized two justifications for this practice.  First, a prompt show-up, shortly after the crime, enhances the reliability of any resulting identification.  Second, a quick show-up will exonerate an innocent person who has been mistakenly apprehended.  As the United States Court of Appeals had stated, "[b]alancing all the doubts left by the mysteries of human perception and recognition, it appears that prompt confrontations . . . will 'if anything, promote fairness by assuring reliability . . . .'" Russell v. United States, 408 F.2d 1280, 1284 (D.C. Cir.), cert. denied,

395 U.S. 928 (1969).[1]

Identification testimony resulting from a show-up identification may not be excluded if the procedures used were not unduly suggestive. Even if the procedures were suggestive, testimony may not be excluded absent a showing, by the defendant, that the identification was unreliable. Stewart v. United States, 490 A.2d 619, 622 (D.C. 1985). The burden rests upon defendant to show that the identification procedures employed were impermissibly suggestive. Simmons v. United States, 390 U.S. 377, 384 (1968).

The mere fact that an eyewitness was shown a single subject does not, standing alone, create a substantial likelihood of irreparable misidentification, Sanders v. United States, 550 A.2d 343, 346 (D.C. 1988), provided such procedures were carried out in close spacial and temporal proximity to the event itself. Wilkerson, supra, 427 A.2d at 927; Cates, supra, 379 A.2d at 970. Here, only a few minutes had passed between the time of the alleged offense and the show-up identification. See Perry, supra, at 364, 449 F.2d at 1026 (show-up 90 minutes after the offense upheld); Glass v. United States, 395 A.2d 796 (D.C. 1978) (show-up within 30 to 45

---

[1] In a comprehensive review of the standard applicable to show-up identifications, the Court of Appeals wrote:

> Although a degree of suggestibility is inevitable in the context of every pretrial confrontation between a witness and a suspect, a defendant is not denied due process of law unless, in the totality of circumstances, the on-the-scene confrontation was unnecessarily suggestive and conducive to a substantial likelihood of irreparable misidentification. In considering the totality of the circumstances, an immediate on-the-scene confrontation has uniquely powerful indicia of reliability which more than counterbalance any suggestivity, absent some special elements of unfairness. Furthermore, something more egregious than mere custodial status is required in order to establish such special unfairness.

Singletary, supra, 383 A.2d at 1068.

minutes upheld). Neither does the appearance of custody necessarily establish that the show-up identification was unduly suggestive. Garris v. United States, 559 A.2d 323, 327 (D.C. 1989).

Assuming arguendo that the identification in this case was suggestive, the identification is nonetheless admissible because it is sufficiently reliable. See Manson v. Braithwaite, id. Factors to be used in determining the reliability of an identification procedure include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199 (1972). Clearly due process will not be offended by the admission at trial of testimony describing the circumstances under which Defendant was identified.

**2.    No Reasonable Likelihood of Mistaken Misidentification at Trial Precludes Necessity for Line-Up**

No court has ever held there is an absolute constitutional right to a lineup. United States v. King, 461 F.2d 152, 155 (D.C. Cir. 1972). Although a defendant has no constitutionally-protected right to a court-ordered lineup, Berryman v. United States, 378 A.2d 1317, 1319 (D.C. 1977), a "trial court has authority to order an out-of-court lineup on defense motion . . . in the exercise of its discretion," id. at 1320. In Jackson v. United States, 395 A.2d 99 (D.C. 1978), the Court of Appeals held that "trial court discretion [in this regard] should turn on three factors: whether the motion [for a lineup] is timely, [whether] the identification is materially at issue, and [whether], absent a lineup, there is a reasonable likelihood of mistaken misidentification." Id. at 104 (quoting Berryman, 378 A.2d at 1320; internal quotation marks omitted).

The complainant in Berryman was accosted by her assailant at gunpoint on a dark and rainy night. See 378 A.2d at 1318. She was in the assailant's presence for only five minutes before she ran away and flagged down an officer. Id. The officer drove her back through the neighborhood until she spotted a man wearing identical clothing as the assailant and then identified him during a show-up. Id. Although the complainant was "upset" when she reported the incident to the police officer, did not provide a detailed description of her assailant, the gun was never found, and there was no other direct or circumstantial evidence linking the defendant to the crime, id., the court nevertheless upheld the trial court's ruling that the risk of misidentification did not justify the defense request for a lineup.

The complainant in Jackson was driving through an alley at night when two robbers stopped his car at gunpoint, relieved him of his keys and money, and fled. See 395 A.2d at 101. The complainant chased the two men at a distance of one-half to three-quarters of a block but lost them when they entered a car and drove away. Id. After the complainant described the car to a police officer, who learned that it had been traffic-stopped a few blocks away, he was brought to the car for a show-up and identified one of his assailants. Id. at 101-02. Although the Court of Appeals acknowledged that "[t]he showup scene was suggestive," id. at 105, and there was testimony that the complainant had told police officers he "was upset and unsure of his ability to identify either assailant," id. at 104, the Court of Appeals once again upheld the trial court's decision that the risk of misidentification did not justify the defense request for a lineup, id. at 105-06. (The Court of Appeals relied in part on the limited nature of the identification testimony at trial: the complainant did not identify the defendant as his assailant, but rather as the person whom he had earlier identified as his assailant during the show-up. Id.)

Berryman and Jackson are the only cases in the District of Columbia to have considered the standards governing a defense motion for a lineup. In both cases, the trial court denied the Defendant's lineup motion, and the Court of Appeals affirmed on the ground that the risk of misidentification did not justify the extraordinary request for a lineup. This case is no different: although we concede that Defendant's motion is timely, the Defendant cannot meet the other two necessary factors.  Government Witness A in this case watched as the Defendant crossed the street in front of Government Witness A, stop one traffic lane over and in front of Government Witness A, and take enough time to produce a handgun and throw it into the truck bed before continuing his attempted, and short-lived, escape from the police. MPD Ofc. Banks' account of the pursuit mirrors that of Government Witness A, and Ofc. Banks participated in the apprehension of the Defendant only moments and steps after the gun is tossed.  Also, unlike the defendants in both Berryman and Jackson who were observed at night, the Defendant in this case was observed while daylight was still present by two different witnesses.

There is no reasonable likelihood of mistaken misidentification.  As the Defendant cannot succeed in showing that there is the risk of misidentification, there is no justification for a lineup. Indeed, the facts of this case create both a far less compelling argument for a lineup than the facts of Berryman or Jackson did, and present a far smaller risk of mistaken identification.

WHEREFORE, the United States respectfully submits that both Defendant's motion to compel a lineup and to suppress identification evidence should be denied.

        Respectfully submitted,
        KENNETH L. WAINSTEIN
        United States Attorney
        D.C. Bar Number 451058

BY: _____

**CARLOS F. ACOSTA**
**Special Assistant United States Attorney**
**D.C. Bar Number 443373**
**Organized Crime and Narcotics Section**
**555 4th Street, N.W.  #4108**
**Washington, DC 20001**
**(202) 514-4922; Fax: (202) 353-9414**