IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v | : | Crim. No 05-170 (RJL) |
| | : | |
| CLIFTON RAY GORHAM | : | |

DEFENDANT'S RESPONSE TO GOVERNMENT OPPOSITION
TO MOTION TO SUPPRESS IDENTIFICATION AND
<u>MOTION FOR DEFENSE-REQUESTED LINE-UP</u>

Defendant, Clifton Gorham, through undersigned counsel, respectfully submits the following response to the Opposition of the United States to his Motion To Suppress Identifications and his Motion For A Defense-Requested Lineup.

I. PROCEDURAL HISTORY

1. On June 20, 2005, Ms. Michelle Peterson, prior counsel for Defendant, filed a Motion To Suppress Identification Evidence on behalf of Defendant.[1] On November 15, 2005, undersigned counsel filed a motion to adopt the motion filed by previous counsel.

2. On November 16, 2005, undersigned counsel filed a Motion For Defense-Requested Lineup requesting that the Court order a line-up to be conducted prior to the trial for any government witnesses that have not previously identified Defendant in other identification procedures but whom the government intended to request that they attempt a courtroom identification of Defendant.

---

[1] Ms. Peterson later moved to withdraw as counsel, which was granted. Undersigned counsel entered his appearance on August 16, 2005.

3. Counsel for Defendant requested information from the prosecutor concerning the results of any identification procedures conducted with government witnesses to try and identify Defendant as the perpetrator of the charged offenses. On December 8, 2005, the Assistant United States Attorney assigned to the case provided counsel with a letter that stated in pertinent part:

> There was no photo array or line-up procedure conducted in this case. There is one civilian witness who would testify that he saw your client throw the recovered handgun into the truck bed. He would also state that while he was still at the scene talking to the officers, he saw your client in police custody, and confirmed that your client was the man who threw the gun into the truck bed.

4. On December 13, 2005 counsel filed a supplement to the Motion For Defense-Requested Line-up specifically asking that the Motion include this witness, currently identified by the parties as "Witness A."  On December 15, 2005, the United States filed a motion in Opposition to both the Motion To Suppress Identifications and the Motion For  A Defense-Requested Lineup. In that Opposition, the United States addressed only the identification made by Witness A; therefore, Defendant <u>assumes</u> there were no other identifications of Defendant (other than by Officer Banks) and that there are no other witnesses whom the United States intends to ask make an in-court identification.

II. THE SUPPRESSION MOTION

   A. The Need For A Hearing

5. Defendant agrees with the United States that the general "two-pronged" analysis of *Manson v. Brathwaite*, 432 U.S. 98 (1977) applies to his suppression motion.

2

The first question is whether the identification procedure is "suggestive," that is one which entails a "very substantial likelihood of irreparable misidentification," *Id* at 116. The second question is whether, notwithstanding the suggestive nature of an identification procedure, the identification is "reliable."

6. Although the general contours of the law to be applied are clear, as set forth below, the actual facts surrounding the identification by Witness A are far from clear in the record. Defendant requests a hearing on the motion to suppress identification because the Court cannot answer either "prong" of the *Brathwaite* analysis without holding such a hearing.[2]

B. Suggestivity

7. It appears that Defendant was in custody of the police and was brought back in to the vicinity of Witness A. While it is unclear if this was intentional,[3] such a showing of a single suspect to a witness is generally referred to as a "show-up" identification. While such show-up identifications have long been recognized as having potential value, and are not *per se* unconstitutional, *see, United States v. Perry*, 449 F.2d 1026 (D.C. Cir. 1971), they are unquestionably "suggestive," *see, Russell v. United States*, 408 F.2d 1280 (D.C. Cir. 1969); *cert. denied* 395 U.S. 928 (1969). The

---

[2] Defendant acknowledges that, because the government may rely on hearsay at motion hearings, the Court need not hear from Witness A directly. In the event that the United States does decide to meet its burden by calling Witness A at the motion hearing, Defendant requests that he be given advance notice of that fact so that Defendant may decide whether to waive his presence so as not to defeat the very purpose of his motions by allowing Witness A to observe him the courtroom while testifying on the motion to suppress.

[3] *Compare, United States v. Conner*, 462 F.2d 296 (D.C. Cir. 1972) (Witness accidentally viewed defendant while down at police station to identify stolen credit card) with *United States v. Greene*, 429 F.2d 193 (D.C. Cir. 1972) (error to "arrange" meeting between defendant and witness.)

question is <u>how</u> suggestive. The greater the indicia of custody, the greater the suggestivity, *Id.* The record is empty as to many factors which the Court should consider in evaluating the suggestivity, to include the degree of restraint, the number and uniform of the police officer(s), what, if anything, was said to Witness A, and the lapse in time between the observation and identification.

C. Reliability

8. The Supreme Court in *Neil v. Biggers,* 409 U.S. 188, 199-200 (1972) and *Manson v. Brathwaite, supra* at 114, recognized several factors, which can be applied to determine the reliability of an identification:

> (1) the opportunity of the witness to view the criminal during the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.

9. It is not universally accepted that these factors are exhaustive, exclusive or even accurate.[4] Dr. Robert Buckhout, a psychologist who was permitted to testify by the trial judge in *People v. Brooks*, 490 N.Y.S.2d 692, 694 (Co. Ct., 1985) identified a much more detailed list of factors:

> (1) the delay between the event and the identification,
> (2) stress;

---

[4] Although often listed as a factor by courts, including the Supreme Court in *Neil v. Biggers* and *Manson v. Brathwaite supra*, the scientific community concerned with identification issues seems in agreement that <u>accuracy of identification has little correlation to confidence in that identification</u>. *See, People v. McDonald,* 690 P.2d 709, 721 (Cal. 1984); *State v. Chapple,* 660 P.2d 1208, 1221 (Ariz. 1983)*; Skamarocius v. State*, 731 P.2d 63 (Alas. App. 1987); *Rodriguez v. Commonwealth,* 455 S.E.2d 724 (Va. Ct. App. 1995). *Accord*, Wells and Lindsay, "Eyewitness Accuracy," 64 *Journal of Applied Psychology* 440 (1979); Deffenbacher, "Eyewitness Accuracy and Confidence: Can We Infer Anything About Their Relationship?" 4 *Law & Human Behavior* 243 (1980). Indeed the Supreme Court of Massachusetts, in *Commonwealth v. Santoli,* 680 N.E. 2d 1116 (Mass. 1997), ordered that juries were not to be told they could evaluate identifications based upon the "strength of the identification," precisely because there was no scientific correlation between confidence and accuracy.

      (3) the violence of the situation;
      (4) assimilation of post-event information;
      (5) the cross-racial aspect of the identification;
      (6) the selectivity of perception;
      (7) the "filling in" phenomenon;
      (8) expectancy;
      (9) the effect of repeated viewings;
      (10) the lack of a correlation between confidence and reliability;
      (11) the motivation of the victim to make a correct identification;
      (12) the motivation of the police to make an arrest;
      (13) the introduction of suggestiveness through photo arrays;
      (14) the availability of a "zero option;" and
      (15) the effect of what a witness is told after the identification is made.

10. The _precise_ facts about the opportunity of Witness A to observe the events in question as well as other questions about his ability to subsequently identify the perpetrator are unknown. For example, although the apparent distance between Witness A and the man who discarded the pistol was not large, there is no indication that the man actually turned his _face_ towards Witness A. It is unclear if Witness A gave any description to the police of the man, or his clothing, _prior_ to being shown Defendant. The apparent duration of the opportunity for Witness A to view the man who discarded the pistol was mere seconds. There is no evidence in the record about the visual acuity, physical or mental condition of Witness A at the time of his observation. All of these, and other factors, should be explored and considered by the Court before ruling on the reliability of any identification made by Witness A.

    D. The Tainting Of Any In-Court Identification

11. Defendant assumes that the United States will have Witness A attempt to make an in-court identification of Defendant. Defendant submits that any subsequent identification should be suppressed if it is tainted by an impermissible show-up

5

identification. The Supreme Court in *Simmons v. United States*, 390 U.S. 377, 383-384 (1968) noted:

> Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent line-up or courtroom identifications.

*Accord*, *United States v. Wade,* 388 U.S. 218 (1967) (independent origins test for admissibility of in-court identification after suggestive out-of-court identification).

III. THE DEFENSE-REQUESTED LINE-UP

12. To the extent that the United States asserts, and the Court finds, there was no formal identification procedure conducted with Witness A, the question still remains as to whether to require a pretrial line-up to be conducted at the request of Defendant. If the Court rules that the show-up identification is admissible, and Witness A testifies at trial, his identification of Defendant at the scene would be admissible under Federal Rule of Evidence 801 (c)(1)(C). However, allowing an in-court identification changes the dynamics of that identification significantly. If Witness A makes no in-court identification, or fails to select Defendant at a line-up, then Defendant's argument to the jury that the prior identification was the product of the highly suggestive situation of seeing Defendant held in custody, gains great force. For the reasons set forth in his initial Motion, Defendant submits that there is a much greater likelihood that witness A will make an <u>accurate</u> decision about an identification of Defendant if it is attempted in the context of a non-suggestive line-

up,[5] instead of the courtroom setting, where Defendant would be seated alone with his counsel at defense table.

13. In its Opposition to Defendant's Motion For A Defense-Requested Line-up, the United States relies on two old cases from the District of Columbia Court of Appeals, *Berryman v. United States*, 378 A.2d 1317 (D.C. 1977) and *Jackson v. United States*, 395 A.2d 99 (D.C. 1978). Whatever their applicability,[6] precedent from the Circuit Court of Appeals is much more supportive of pretrial line-ups. *See, United States v. Caldwell*, 465 F.2d 669 (D.C. Cir. 1972). *See also, United States v.* Smith, 473 F.2d 1148 (D.C. Cir. 1972) (noting that where witness may have opportunity to first view defendant in court during preliminary hearing, counsel should request line-up be conducted first.)[7]

14. In the end, Defendant agrees with the United States that the key issue the Court must resolve is the reliability of any in-court identification by Witness A. However, the Court can hardly make such a determination on the record before the Court at this time. The very same issues which Defendant sets forth in Section III, C,

---

[5] As to the procedures to be followed at any such line-up, Defendant requests that a <u>minimum</u> the line-up comport with the standards set forth in <u>Eyewitness Identification: A Guide for Law Enforcement</u>, U.S. Department of Justice, Office of Justice Programs (Oct. 1999) (Accepted research has identified additional ways in which the accuracy of a line-up may be increased, *see* Gary L. Wells, Mark Small, Steven Penrod, Roy S. Malpass, Solomon M. Fulero, and C.A.E. Brimacombe, *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, <u>Law and Human Behavior</u>, Vol 22, No. 6, 1998.)

[6] In *Jackson v. United States, supra,* the witness was not identifying the defendant as the perpetrator, but rather as the person he had identified at a show-up.

[7] Indeed, the failure to grant such a defense request may be reversible error, United *States v. Caldwell*, 481 F.2d 487 (D.C. Cir. 1973) (agreeing with lower court after remand that there was no way to remedy failure to have held line-up prior to trial.)

7

*supra*, are also the same issues which the Court must confront in determining whether to order a pretrial lineup. Thus, Defendant submits an evidentiary hearing should be held on that issue as well.[8]

                                       Respectfully submitted

                                                /s/

                                       Richard K. Gilbert
                                       Bar. No. 939884
                                       601 Pennsylvania Avenue, N.W.
                                       Suite 900, South Building
                                       Washington, D.C.  20004
                                       (202) 898-0857

                                       Attorney for Defendant

---

[8] If the United States decides to call Witness A to testify at such a hearing, Defendant requests advance notice of that fact. *See*, note 2, *supra*.